# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 08-845-GW(MANx) | Date | July 3, 2008 |
| Title | Los Padres Forestwatch v. U.S. Forest Service, et al. | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Wil Wilcox | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Erik B. Ryberg | Andrew A. Smith, DOJ |

**PROCEEDINGS:**    **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (filed 04/25/08); AND FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (filed 05/16/08)**

Hearing is held.  The tentative circulated is adopted as the Court's final ruling (attached hereto).

Plaintiff's Motion for Summary Judgment is **granted in part.**  Federal Defendants' Motion for Summary Judgment is **granted in part.**  The Court dismisses counts three and four of the complaint.

Parties shall file the initial stay (proposed) orders by no later than 12:00 p.m. on July 10, 2008.

A Status Conference is set for **July 31, 2008 at 8:30 a.m.**  Parties may appear telephonically, if notice is given to the clerk within two business days of the hearing date.


IT IS SO ORDERED.

|  | : | 37 |
|---|---|---|

Initials of Preparer    JG

**Los Padres Forestwatch v. U.S. Forest Service, et al.**, Case No. CV 08-845 GW (MANx)
Tentative Rulings on Cross-Motions for Summary Judgment

## I. Background

On February 5, 2008, Los Padres Forestwatch ("Plaintiff") sued the United States Forest Service ("Forest Service") and Peggy Hernandez, Supervisor of the Los Padres National Forest (collectively "Defendants"), to stop a planned project in the Los Padres National Forest, which provided for the removal by a contract commercial logger of dead and/or dying trees along roadways and near recreational sites in about 1,000 acres[1] that burned in the 2006 Day Fire.[2]  *See* First Amended Complaint ("FAC") ¶¶ 1, 11.  Plaintiff identifies four claims for relief in its FAC: 1) failure to prepare an Environmental Assessment ("EA"); 2) use of improper categorical exclusion ("CE"); 3) failure to evaluate and reveal impacts to the endangered California condor, a federally designated endangered species; and 4) failure to protect sensitive species and diversity (including the "yellow-blotched salamander").

The Forest Service issued the decision authorizing the project at issue in an October 11, 2007 document titled "Decision Memo for the Day Fire Hazard Tree Project" ("Decision Memo").  *See* Defendants' Statement of Uncontroverted Facts and Conclusions of Law ¶ 30; Plaintiff's Statement of Genuine Issues of Material Fact ¶ 30; LPDF-0167 thru 0217.  On November 29, 2007, Plaintiff filed an administrative appeal of the Forest Service's decision on the project, but the Forest Service's Regional Office affirmed the decision on January 14, 2008.  *See* LPDF-0001 thru 008.

Plaintiff alleges that the Forest Service authorized the project without preparing – as required by the National Environmental Policy Act ("NEPA") and regulations issued pursuant thereto – an EA to determine whether the logging project will impair the ecological values of the Day Fire area.  *See* FAC ¶ 1.  It argues that the Forest Service has avoided the

---

[1] As noted further below, Defendants assert that the salvage logging (or hazard-tree-removal, depending on one's view of things) of the project would cover only 350 acres.

[2] Between September 4 and October 2, 2006, approximately 150,000 acres were burned in the Los Padres National Forest.  *See* pages 938-39 of the Administrative Record – Day Fire Hazard Tree Project. Henceforth, reference to the Administrative Record will be to "LPDF-[page number]".  "LPDF-" refers to the Bates number pagination of the Administrative Record lodged with this Court on CD-ROM.

preparation of an EA by categorizing the project as a "routine road maintenance" project. *Id.* ¶ 2.  Plaintiff claims that the project "also entails road construction activities including (1) road widening, (2) expansion of curves, (3) safety turnouts, and (4) the construction of log landings, most or all of which will be accomplished using heavy equipment." *Id.* ¶ 27.[3] Plaintiff further contends that the Forest Service's handling of the project's approval has failed to evaluate and reveal the impacts the project would have on the California condor which allegedly enjoys special protections "including standards in the Los Padres Forest Plan to protect areas within one-half mile of traditional condor roost trees."[4] *Id.* ¶ 43.[5]  Finally, Plaintiff alleges that the salvage logging proposed here "has demonstrably negative effects on wildlife, including species such as the yellow-blotched salamander, a species the Forest Service has designated to be 'sensitive' and at risk of needing federal protection."[6] *Id.* ¶ 52.

Plaintiff seeks a declaration that the Forest Service's failure to conduct the allegedly necessary environmental review violates NEPA, NFMA and the Administrative Procedures Act ("APA"), and seeks injunctive relief ordering the review to be conducted before logging commences.  *See* FAC ¶ 4.  In particular, Plaintiff wants the Court to declare that 1) the Forest Service's decision to conduct the salvage logging project under a CE is arbitrary and capricious, an abuse of discretion, and not in accordance with law, and 2) the project may only be conducted with at least an EA and a Finding of No Significant Impact.

Plaintiff and Defendants now both move for summary judgment.

---

[3] As noted further below, whether or not the project includes road widening or the construction of safety turnouts remains the source of some dispute.

[4] Plaintiff alleges that the area covered by the project "contains traditional condor roost trees, but this fact was not revealed in any of the documents sent to the public for review."  *See* FAC ¶ 45.  Instead, those documents represented that the appearance of a condor in the area would be an "'extremely rare event' that would probably be the result of a condor being sick." *Id.* ¶ 46.  However, other documents supposedly acknowledge that a high-use condor flyway is "near the Alamo Mountain portion of the project area." *Id.* ¶ 47.  Plaintiff alleges that the flyway is directly overhead the Alamo Mountain portion of the project area. *Id.* ¶ 48.

[5] The FAC contains two paragraphs numbered "43."  This citation is to the second of those two paragraphs.

[6] Plaintiff alleges that the National Forest Management Act ("NFMA"):1) "requires that biological diversity be protected in forest planning, and Forest Service sensitive species require a higher degree of protection and analysis before their habitat can be impaired in a federal action", and 2) "requires that units of the National Forest system protect biological diversity through compliance with Forest Plan Standards."  *See* FAC ¶¶ 53-54.  Thus, Plaintiff contends that Defendants have violated the NFMA (along with NEPA) with respect to both the yellow-blotched salamander and the California condor. *Id.* ¶¶ 53-55.

## II. **Analysis**

### A. Summary Judgment Standards

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In a motion for summary judgment:

> [if] the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the non-moving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, "*specific facts* showing that there is a genuine issue for trial."

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing, among other cases, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Elec.*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir.1991). The evidence presented by the parties must be admissible. *See* Fed.R.Civ.P. 56(e). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

Under the limitations imposed by the APA, summary judgment rulings are appropriate in suits challenging agency administrative decisions. *See, e.g., Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994); *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).

### B. The Merits

#### 1. Plaintiff did not Exhaust its Claims Regarding the California Condor

Defendants argue that Plaintiff's claims are barred here because they were not raised in Plaintiff's administrative appeal, as mandated by 7 U.S.C. § 6912(e). Section 6912(e) states that "a person shall exhaust all administrative appeal procedures established by the Secretary [of Agriculture] or required by law before the person may bring an action in a court

3

of competent jurisdiction against" the Secretary of Agriculture, the Department of Agriculture, or an agency, office, officer, or employee of the Department of Agriculture. The Forest Service is covered by this section. *See Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002); *see also* 36 C.F.R. Part 215 (setting forth the notice, comment and appeal procedures for national forest system projects and activities). The APA also requires administrative exhaustion. *See Idaho Sporting Congress*, 305 F.3d at 965 (characterizing 5 U.S.C. § 704 as requiring exhaustion). Thus, to the extent Plaintiff's claims were not raised administratively and Plaintiff has not offered any reason to excuse that failure, Plaintiff may not bring the claims here. *See e.g. McBride Cotton & Cattle Co. v. Veneman*, 290 F.3d 973, 980 (9th Cir. 2002) (holding that failure to exhaust pursuant to section 6912(e) does not deprive a court of jurisdiction, so failure to exhaust may be excused in certain circumstances); *see also* 36 C.F.R. § 215.21 ("It is the position of the Department of Agriculture that any filing for Federal judicial review of a decision subject to appeal is premature and inappropriate unless the plaintiff has first sought to invoke and exhaust the appeal procedures in this part.").

However, Defendants do not argue that Plaintiff failed entirely to exhaust its administrative remedies, but only that not all of the arguments Plaintiff raises herein were included within the administrative appeal. Defendants specifically argue that Plaintiff did not raise any "road widening" claims or any claims concerning the California condor in its administrative appeal. *See* Defendants' Motion at 8:3-17. In particular, Defendants ask that the Court enter summary judgment in their favor with respect to three "claims":

> 1) that the Forest Service violated NEPA by applying the road maintenance CE to a project that involved road widening...; 2) that potential effects to [sic] the California condor represented an extraordinary circumstance precluding application of the CE for the Project under NEPA...; and 3) that the Project violates NFMA because it is not consistent with condor standards in the Forest Plan....

Defendants' Motion/Opposition at 9:11-16.

"Claims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met." *Idaho Sporting Congress*, 305 F.3d at 965; *see also Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899 (9th Cir. 2002) ("The plaintiffs have

exhausted their administrative appeals if the appeal, taken as a whole, provided sufficient notice to the Forest Service to afford it the opportunity to rectify the violations that the plaintiffs alleged."). While Plaintiff did raise an "extraordinary circumstance" argument in its administrative appeal, that argument was limited in its application to the effect the project would have on Piru Creek and the yellow-blotched salamander. *See* LPDF-0042 & 0043; Defendants' Motion/Opposition at 8:6-12. Neither the creek nor (as discussed further below) the salamander are referenced as extraordinary circumstances in Plaintiff's summary judgment motion, which instead focuses on the California condor.

To the extent that Plaintiff responds on the issue of exhaustion, that response is limited to whether it raised the issue of road widening in the administrative appeal. *See, e.g.*, Plaintiff's Statement of Genuine Issues of Material Fact ¶¶ 31, 35. Plaintiff makes no mention, whatsoever, of its California condor arguments. Therefore, Plaintiff has effectively conceded that it did not exhaust any argument or claim Plaintiff proffers here in connection with the condor, whether under NEPA, the NFMA or otherwise. *See* 36 C.F.R. § 215.14(b)(6), (7), (9) (requiring that any appeal include "[a]ny specific change(s) in the decision that the appellant seeks and rationale for those changes", "[a]ny portion(s) of the decision with which the appellant disagrees, and explanation for the disagreement" and "[h]ow the appellant believes the decision specifically violates law, regulation, or policy"). Plaintiff offers no reason to excuse its failure to administratively exhaust those claims. *See McBride Cotton*, 290 F.3d at 980 (indicating that exhaustion is required "unless the suit alleges a constitutional claim which is (1) collateral to a substantive claim of entitlement, (2) colorable, and (3) one whose resolution would not serve the purposes of exhaustion") (internal quotation marks omitted); *see also Western Watersheds Project v. U.S. Forest Serv.*, No. CV-07-151-E-BLW, 2007 U.S. Dist. LEXIS 83911, *4-5 (D. Id. Nov. 13, 2007) (excusing exhaustion requirement due to tight timeframe before project would go into effect).

Plaintiff has presented evidence that it did raise the road widening issue during the course of its administrative appeal, principally in connection with noting that the Decision Memo failed to address whether such road work would be needed as referenced in the "Day Fire Salvage Opportunity and Economic Assessment" issued on February 10, 2007. *See* Plaintiff's Reply/Opposition at 20; LPDF-0047. In their Reply, Defendants continue to insist

that the issue was not sufficiently raised. Under *Native Ecosystems*, they are incorrect.[7]

However, as discussed below, the outcome of this case does not depend on that issue.

Ultimately, even if Plaintiff may not bring all of the claims it raises herein, it did exhaust the principal issue as to whether the Forest Service permissibly relied upon the CEs they cited. *See, e.g.*, *Native Ecosystems*, 304 F.3d at 899-900; *Wilderness Soc'y v. Bosworth*, 118 F.Supp.2d 1082, 1102 (D. Mont. 2000) ("[B]ecause the Defendants were on notice of Plaintiffs' request for a new [Environmental Impact Statement] and had an opportunity to decide whether to issue one, Plaintiffs properly exhausted the administrative appeals process on this issue."). However, because of Plaintiff's failure to exhaust administrative remedies with respect to its arguments tied to the California condor, the Court will grant summary judgment in Defendants' favor on Plaintiff's third claim for relief and partial summary judgment with respect to Plaintiff's fourth claim for relief insofar as it is based upon the potential effects of the project on the California condor.

### 2. The Necessity of a Further Environmental Review

Plaintiff claims that the Forest Service violated NEPA by assessing the potential environmental impacts of the project pursuant to CEs, instead of examining those impacts in an EA or Environmental Impact Statement ("EIS"). In addition, or perhaps more specifically, Plaintiff argues that the CEs, which the Forest Service employed to avoid having to perform an EA, are inapplicable to the circumstances and that the failure to perform an EA violated the APA, NFMA and NEPA.

As set forth in NEPA regulations, an EIS is a detailed written statement required by 42 U.S.C. § 4332 which serves "as the means of assessing the environmental impact of proposed agency actions." 40 C.F.R. § 1502.2(g); see also 40 C.F.R. § 1508.11. An agency can decide to prepare an initial EA in order to determine whether a full EIS is necessary or whether it can simply issue a "finding of no significant impact" ("FONSI"). 40 C.F.R. §§

---

[7] Defendants make the further argument that the project actually does not encompass any road widening. *See* Federal Defendants' Statement of Genuine Issues of Material Fact ¶ 5; Defendants' Statement of Uncontroverted Facts and Conclusions of Law ¶ 8; LPDF-0210. Although those possibilities did appear in the "Day Fire Salvage Opportunity and Economic Assessment" memo, *see* LPDF-0509, they were purportedly not included in the Decision Memo approving the project. Nevertheless, Plaintiff perhaps remains understandably unclear whether the Forest Service really means that no road widening will occur. However, it does appear somewhat inconsistent for the Defendants to argue that the Plaintiff has failed to exhaust the road widening claim when the Defendants themselves have not made it certain whether such road work will or will not be done.

1501.3 & 1508.9. An EA is described as "a concise public document ... that serves to: (1) [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS or FONSI]." [8] Id. at § 1508.9(a). In addition, an agency need not prepare an EA or EIS if it determines that the proposed action falls within a CE. 40 C.F.R. § 1501.4(a)(2). A CE is defined in 40 C.F.R. § 1508.4 as:

> *Categorical exclusion* means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. * * * * * Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

### a. Standard of Review

The Forest Service's actions here are governed by the standards made applicable by the APA. Under the APA, a court must set aside any agency action, findings or conclusions which are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002). This includes the Forest Service's application of a CE to exempt a project from the need to prepare an EA or an EIS. *See California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002); *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 & n.5 (9th Cir. 1996). When an agency has taken action without observance of the procedure required by law, the action is to be set aside. *See Idaho Sporting Congress Inc. v. Alexander*, 222 F.3d 562, 567 (9th Cir. 2000). As observed in *Norton*, 311 F.3d at 1176:

> It is difficult for a reviewing court to determine if the application of an exclusion is arbitrary and capricious where there is no contemporaneous documentation to show that the agency considered the environmental consequences of its action and decided to apply a categorical exclusion to the facts of a particular decision. Post hoc invocation of a categorical exclusion does not provide assurance that the

---

[8] An EA must include a discussion of the need for and environmental impacts from the proposed project, among other things. *See* 40 C.F.R. § 1508.9(b).

agency actually considered the environmental effects of its action before the decision was made.

b. NEPA's Statutory and Regulatory Requirements

The Ninth Circuit recently summarized the statutory and regulatory requirements for federal agencies in analyzing the environmental consequences of their actions.

> NEPA requires all federal agencies to prepare a detailed [EIS] for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Under [Council on Environmental Quality ("CEQ")] implementing regulations, an agency as a preliminary step may prepare an [EA] to determine whether the environmental impact of the proposed action is significant enough to warrant an EIS. *See* 40 C.F.R. § 1508.9; *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001). If an EA establishes that the agency's action "may have a significant effect upon the ... environment, an EIS must be prepared." *Id.* (internal quotation marks omitted) (alteration in original) (emphasis in original). If the proposed action is found to have no significant effect, the agency must issue a finding to that effect (a "FONSI"), "accompanied by a convincing statement of reasons to explain why a project's impacts are insignificant." *Id.* (internal quotation marks omitted).
>
> However, an agency does not have to prepare an EIS or an EA if the action to be taken falls under a [CE]. *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 853-54 (9th Cir. 1999) (citing 40 C.F.R. § 1508.4). "Pursuant to [CEQ] regulations, each agency is required to identify categories of actions which do not individually or cumulatively have a significant effect on the human environment." *Id.* (citing 40 C.F.R. §§ 1507.3(b)(2)(ii), 1508.4). The CE procedures developed by agencies "shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect," 40 C.F.R. § 1508.4, in which case an EIS or an EA/FONSI would be required.

*Sierra Club v. Bosworth*, 510 F.3d 1016, 1018-19 (9th Cir. 2007). CEs, "by definition, are limited to situations where there is an insignificant or minor effect on the environment." *Alaska Ctr.*, 189 F.3d at 859; *see also id.* at 854 ("[E]ach agency is required to identify categories of actions which do not individually or cumulatively have a significant effect on the human environment."). An agency may adopt a CE when it has made these findings pursuant to NEPA procedures it has adopted. *See* 40 C.F.R. § 1508.4.

The court may determine that the Forest Service's decision to apply a CE to a

particular project was arbitrary and capricious only:

> if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Sierra Club*, 510 F.3d at 1023. When applying a CE to a project "the agency must articulate a rational connection between the facts found and the conclusions reached." *Id.* A decision cannot withstand such review if it is not "fully informed and well-considered" or if it the agency made a clear error of judgment. *Id.*

### i. The CEs at Issue in This Case

Here, the Forest Service invoked CEs 31.12.4 and 31.12.5 (respectively, "Repair and maintenance of roads, trails, and landline boundaries" and "repair and maintenance of recreation sites and facilities") to justify the salvage log operation without first performing an EIS or an EA. CE 31.12.4 ("the Road Maintenance CE") states as follows:

> 4. Repair and maintenance of roads, trails, and landline boundaries. Examples include but are not limited to:
>   a. Authorizing a user to grade, resurface, and clean the culverts of an established National Forest System road.
>   b. Grading a road and clearing the roadside of brush without the use of herbicides.
>   c. Resurfacing a road to its original condition.
>   d. Pruning vegetation and cleaning culverts along a trail and grooming the surface of the trail.
>   e. Surveying, painting and posting landline boundaries.

Plaintiff's motion, Exh. 1 (Forest Service Handbook) at 7-8 (available at 57 Fed. Reg. 43180). CE 31.12.5 ("the Site Maintenance CE") provides as follows:

> 5. Repair and maintenance of recreation sites and facilities. Examples include but are not limited to:
>   a. Applying registered herbicides to control poison ivy on infested sites in a campground.
>   b. Applying registered insecticides by compressed air sprayer to control insects at a recreation site complex.
>   c. Repaving a parking lot.
>   d. Applying registered pesticides for rodent or vegetation control.

Plaintiff's motion, Exh. 1 at 8; (available at 57 Fed. Reg. 43180).

Plaintiff argues that only CE 31.2.13 ("the Tree Salvage CE") is potentially applicable here, but that category contains a 250-acre limitation, whereas the project proposed here covers in excess of that limit.[9] CE 31.2.13 delineates a categorical exclusion for:

> 13. <u>Salvage of dead and/or dying trees not to exceed 250 acres, requiring no more than 1/2 mile of temporary road construction.</u>  The proposed action may include incidental removal of live or dead trees for landings, skid trails, and road clearing. Examples include but are not limited to:
>> a. Harvest of a portion of a stand damaged by a wind or ice event and construction of a short temporary road to access the damaged trees.
>> b. Harvest of fire-damaged trees.

### ii. Application of Those CEs to the Project

Defendants argue that the CEs they employed were proper given the project at issue. In determining whether the Forest Service appropriately selected the CEs here to the exclusion of preparing an EA or an EIS, some background discussion of the Forest Service's deliberations is necessary.

Consideration of the project began with a Day Fire Burn Area Emergency Response Assessment completed in November 2006, which, according to Defendants' characterization of the document, "identified the potential for the public and Forest personnel to be at risk from hazard trees on roads and trails in the burn area."[10]  *See* Defendants' Statement of Uncontroverted Facts and Conclusions of Law ¶ 2; Plaintiff's Statement of Genuine Issues of

---

[9] Plaintiff repeatedly references 1,000 acres in describing the project. Defendants assert, however, that the salvage or hazard logging would only occur on 350 acres of the 1,000-acre project area. Even if true, however, that logging operation exceeds the 250 acre-specification in Category 31.2.13.

[10] Defendants admit that all of the trees to be removed on the 350 covered acres are what it terms "hazard trees." Defendants' Motion/Opposition at 2 n.3; Federal Defendants' Statement of Genuine Issues of Material Fact ¶ 3; LPDF-0190. Hazard trees are defined as "trees having 1) a defect which could fail and break off, and 2) threatening a public use hazard area such as roads, campgrounds, and parking areas." *See* Defendants' Statement of Uncontroverted Facts and Conclusions of Law ¶ 4; LPDF-0419. Defendants do not appear to deny, however, that the trees at issue here are all hazard trees because they are fire-damaged. *See* Defendants' Statement of Uncontroverted Facts and Conclusions of Law ¶ 4 ("Many trees along forest and county roads were killed by the fire and are now considered hazard trees for public use."); Defendants' Statement of Genuine Issues of Material Fact ¶ 17 ("The proposal is to remove hazard trees created by the Day Fire.... Hazard tree removal will be performed on a net 1.7% of the 23,000 acres of gross yellow pine forest burned or 0.3% of the entire burn area.") (quoting LPDF-0418). Elsewhere, however, Defendants reference the hazard trees at issue as "mostly fire-killed." Defendants' Statement of Uncontroverted Facts and Conclusions of Law ¶ 10; LPDF-0190.

Material Fact ¶ 2; LPDF-0936 thru 0978. The analysis then proceeded with the completion on February 10, 2007, of the "Day Fire Salvage Opportunities and Economic Assessment," which evaluated "the economic viability of salvage opportunities on the Day Fire." Plaintiff's Statement of Material Facts ¶ 15; Defendants' Statement of Undisputed Facts and Conclusions of Law ¶ 5; LPDF-0507 thru 0518. Defendants characterize this document as "an early, preliminary post-fire report to assess economic viability of salvage opportunities, in addition to hazard abatement." Defendants' Motion/Opposition at 16:26-28; *see also* Defendants' Statement of Genuine Issues of Material Fact ¶ 11. On October 11, 2007, when Hernandez ultimately approved the project in the Decision Memo, it was characterized in accordance with the allegedly applicable CEs because the project would accomplish the objective of "removing trees with potential to fall into [a] road right-of-way or recreation site or facility." LPDF-0172.[11]

In the Ninth Circuit, the Forest Service's "interpretation of the meaning of its own [CE] should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation." *Alaska Ctr.*, 189 F.3d at 857. Defendants assert that "the Project is limited to the removal of dead or dying trees that pose a direct threat of falling on or across a road, trail, or recreation site because they are within 150 feet upslope or 100 feet downslope of these areas." Defendants' Motion/Opposition at 2:7-10. They then conclude that this is a reasonable interpretation of the Forest Service's own NEPA provisions, in that "maintaining public safety in these areas by removing only hazard trees on approximately 350 acres of the 1,000-acre Project Area met the scope of the" CEs. *Id.* at 2:11-13. Defendants cite to a 2003 decision from the District of Arizona which upheld this interpretation in a slightly, but crucially, different legal setting. *See Forest Conservation Council v. U.S. Forest Serv.*, 2003 WL 23281957, Civ. No. 03-0054-PCT-FJM (D. Ariz. July 9, 2003), *aff'd*, 110 Fed. Appx. 26 (9th Cir. 2004).

*Forest Conservation* involved a project titled the "Treatment of Dead Trees within or Adjacent to Administrative Sites, Roads, Trails, Developed Recreation Sites, and

---

[11] Plaintiff disputes whether, in fact, Defendants have abandoned all plans for "salvage" logging because the project "proposes to log approximately 1,400 commercially valuable trees and sell them to a sawmill." Plaintiff's Statement of Genuine Issues of Material Fact ¶ 8. Plaintiff cites nothing in the Administrative Record to support this assertion. However, parts of the Decision Memo do appear to support that conclusion. *See e.g.* LPDF-0167 & 0171-72.

Concentrated Use Areas." *Id.* at *1. That project authorized the removal of dead trees "within 500 feet of the boundaries of administrative sites, developed recreation sites, and identified concentrated use areas, within 200 feet of the center line of highly traveled roads open to motor vehicle traffic, and within 100 feet of the center line along heavily used forest system trails." *Id.* at *2. The court noted the inexact relation between the CE's for road and site maintenance and the project at hand ("The application of these three categorical exclusions to the roads and trails decision is not immediately obvious.") and further stated that if it had *de novo* review it might have made a different determination. *Id.* at *3 However, the court still rejected the plaintiff's challenge because there was a "rough comparability" between the road maintenance exclusion examples and the project at hand and the decision was therefore not plainly erroneous. *Id.*

As Plaintiff points out in its Reply/Opposition, the *Forest Conservation* court issued its ruling at a time when the Tree Salvage CE did not exist. In fact, the Tree Salvage CE was published in the Federal Register less than three weeks <u>after</u> the *Forest Conservation* ruling issued. *See* 68 Fed. Reg. 44598; *Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 692 (9th Cir. 2007), *cert. granted sub nom.*, *Summers v. Earth Island Inst.*, 128 S.Ct. 1118 (2008).

The Forest Service itself has designated the Road Maintenance and Site Maintenance CEs (among others, but not including the Tree Salvage CE) as covering "routine administrative, maintenance, and other actions." Plaintiff's motion, Exh. 1 at 6.[12] Although Plaintiff admits that the project does entail some road reconstruction and construction,[13]

---

[12] In fact, Defendants note that "as the Forest Service was in the process of adopting the salvage logging CE, the agency announced that hazard tree projects were appropriately authorized under the maintenance of roads and recreation sites CEs." *See* Defendants' Reply at 16:26-28; 68 Fed. Reg. 33814, 33821 (June 5, 2003). Yet, that does not change the fact that, after the Tree Salvage CE issued, the type of "hazard" tree removal the Forest Service plans here was not added as an example under either the Road Maintenance or Site Maintenance CEs. The newly-added Tree Salvage CE's terms therefore created a relatively obvious apparent conflict or limitation on the Forest Service's understanding of the scope of the Road Maintenance and Site Maintenance CEs (unexpressed in those CEs themselves).

[13] Plaintiff argues that at least some of the road maintenance planned under the project is for purposes of accommodating logging trucks. The "Day Fire Salvage Opportunity and Economic Assessment" acknowledges the need to make "post haul repairs" to roads following logging and one of the roads has "at least 4 curves…which will need to be widened for log truck or low boy traffic, and at least 5 safety turnouts will need to be constructed prior to log haul." LPDF-0509. As noted *supra*, Footnote 9, Defendants take the position that these changes were left out of the project as it was ultimately approved. Given the ultimate recommendation on this motion, Defendants can address this issue further in future environmental review.

Plaintiff's Statement of Material Facts ¶ 5, it asserts that it is not the type of "routine road maintenance" that Category 31.12.4 covers. *See* FAC ¶ 39. Defendants, on the other hand, argue that Plaintiff has in effect conceded the applicability of the "maintenance of roads" CE because it notes that "the proposed logging will likely contribute in some measure to a kind of 'preventative maintenance' of the roadway." Defendants' Motion/Opposition at 15:2-5; Plaintiff's Motion at 14. Defendants surely cannot be correct, however, that because one part of a project comes tangentially within a CE, the entire project – no matter its size or scope – must necessarily fall within that CE.

Other actions that an agency lists as covered by a CE may guide a court in its analysis, even though the examples in a particular CE are non-exclusive. *See West v. Secretary of Dep't of Transp.*, 206 F.3d 920, 928 (9th Cir. 2000). Defendants point out that some of the specific examples cited in the proffered CEs "are activities with a purpose of maintaining safe Forest Service facilities." Defendants' Motion/Opposition at 13:10. There is little reason to doubt that preventing dead or dying trees from collapsing on roads or administrative/recreational sites promotes the maintenance of safe Forest Service facilities. However, that is not the question for purposes of NEPA review. The question is whether, in doing so, the Forest Service was obligated to prepare and issue, at a minimum, an EA.

The only example cited in either the Road Maintenance CE or the Site Maintenance CE which even remotely resembles the project at hand is the second example given for the Road Maintenance CE: "Grading a road and <u>clearing the roadside of brush</u> without the use of herbicides." Plaintiff's motion, Exh. 1 at 8 (Forest Service Handbook). If the list of examples given were the key interpretive factor and if the word "brush" could be interpreted to mean trees that might fall on roads from 100 to 150 feet away, the Forest Service arguably would have been undeniably justified in relying upon the Road Maintenance CE (ignoring, for the moment, the existence of the Tree Salvage CE).

<u>Webster's Third New International Dictionary</u>[14] lists two definitions of the word "brush" which might be applicable. It defines "brush" as "scrub vegetation" and "a dense

---

[14] *See United States v. Wealth & Tax Advisory Servs., Inc.*, 526 F.3d 528, 530 (9th Cir. 2008) (referencing <u>Webster's Third New International Dictionary</u> for definition of "memorandum"); *see also Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1366 (Fed. Cir. 1998) (concluding that definition of "brush" – albeit in another context – taken from <u>Webster's Third New International Dictionary</u> was "not inconsistent with definitions in prior opinions").

growth of forest and undergrowth." <u>Webster's Third New International Dictionary</u> 286 (1981). The latter definition, however, is denoted as "*chiefly Austral*," meaning that it is standard in Australia (but presumably not within the U.S. Forest Service). *Id.*; *see also id.* at 17a, ¶ 8.3.4. <u>The American Heritage Dictionary</u>, meanwhile, defines the word as: "1. a. A dense growth of bushes or shrubs. b. Land covered by such a growth. 2. Cut or broken branches." <u>The American Heritage Dictionary</u> 212 (2d. College Ed. 1982). Although Defendants do not attempt to make the argument that the project fits within the Road Maintenance CE because of the term "brush," it seems clear that it would be absurd for anyone (outside of Australia) to do so.

In any event, in *Alaska Center*, the Ninth Circuit directed courts to look to the "general scope" of the CEs, not to the specific examples.[15] *Alaska Ctr.*, 189 F.3d at 858; *see also* 48 Fed. Reg. at 34,265 (CEQ memorandum titled "Guidance Regarding NEPA Regulations" which encourages agencies to identify CEs using "broadly defined criteria which characterize types of actions that, based on the agency's experience, do not cause significant environmental effects"). Relying heavily on *Alaska Center*, Defendants argue that "[t]he removal of dead trees near roads, trails, and recreation sites so that such trees will not fall on individuals or structures are plainly within the general scope of the CEs for activities that maintain existing Forest Service roads, trails, and recreation sites." Defendants' Motion/Opposition at 13:5-8. Indeed, the Forest Service's Decision Memo states that the CEs applied here "are applicable to this project because hazard tree removal is designed to maintain public access roads and recreation sites and facilities for public safety by removing trees with potential to fall into [a] road right-of-way or recreation site or facility." LPDF-0172; Defendants' Statement of Uncontroverted Facts and Conclusions of Law ¶ 23.

In *Alaska Center*, the question was whether a permit for helicopter-guided skiing and hiking was sufficiently similar to guiding permits, which were listed as a specific example of a CE involving minor, short-term (one-year or less) special uses of National Forest land. *See*

---

[15] Although the CEs Defendants have cited list only non-exclusive examples of actions that fall therein, agencies are to provide "[s]pecific criteria for and identification of those typical classes of action....[w]hich normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (§ 1508.4))." 40 C.F.R. § 1507.3(b)(2)(ii) (emphasis added).

*Alaska Ctr.*, 189 F.3d at 854, 857-58. That case and this case, however, are not similar enough for Defendants' purposes. In *Alaska Center*, the Forest Service did not have an alternative CE the "general scope" of which appeared to specifically govern the proposed project at hand and from which the Court could draw necessary comparisons in considering the scope of the proffered exclusion. That type of comparison is logical and, it would seem, necessary. *See West*, 206 F.3d at 928.[16]

Defendants attempt to buttress the Forest Service's conclusion here by pointing to the conclusion in the Decision Memo that "'past experience and environmental review reveal that hazard tree removal is routine, administrative maintenance' for the treatment of roads, trails, and recreation sites." Defendants' Motion/Opposition at 13:13-15; Defendants' Statement of Uncontroverted Facts and Conclusions of Law ¶ 23; LPDF-0173; *see also* Defendants' Reply at 8:23-9:4. However, if indeed that is true, the Forest Service could have developed (and presumably can in the future develop) an independent CE for the category or list this type of project as one of the examples under the CEs the Forest Service favors here.[17] *See generally Sierra Club*, 510 F.3d at 1025-26; *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). In fact, as the Tree Salvage CE demonstrates, the Forest Service has already conducted an extensive study/analysis and crafted a CE on the precise topic of the environmental impact arising from the removal of dead, dying or fire damaged trees.

NEPA requires the agency to focus its attention "on the environmental consequences of a proposed project." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Even if Defendants' representation of the project as removing hazard trees is more

---

[16] Defendants argue that the Tree Salvage CE is irrelevant to their consideration of whether the project falls under other CEs. Defendants do not satisfactorily explain why a court may not – or the Forest Service need not – use other CEs drafted by the Forest Service to interpret the scope of CEs actually used by the Forest Service in connection with the instant project.

[17] Defendants make much of their own scientific assessment – "numerous actual analyses" – of the likelihood of any environmental effects from the project. Defendants' Motion/Opposition at 15:14-16:1; *see also* Defendants' Reply at 6:8-17, 9:19-24. However, if the project does not fit within a CE, it seems that it does not matter how many "actual analyses" Defendants perform; if they do not prepare at least an EA, the project may not proceed. If Defendants feel that they have performed sufficient "actual analyses" on the effects of such a project, they presumably can add a further CE or list this type of project as a specific example under the road and recreational site maintenance CEs. *See, e.g.*, Defendants' Statement of Genuine Issues of Material Fact ¶ 19 (quoting LPDF-0172-73). Otherwise, it would seem they have already done at least some of the work that would be necessary in preparing an EA. *Id.*

accurate than Plaintiff's portrayal of salvage logging, assuming that the Tree Salvage CE is relevant to the Court's task (as *West* and logic would seemingly indicate), Defendants offer only one explanation for why salvage logging more than 250 acres away from roads is more environmentally suspect than salvage/hazard logging more than 250 acres alongside roads (as is the case here) – namely, the necessity of constructing roads to reach those trees.[18]  In fact, in *Forest Conservation* the Court noted that the major environmental effect "occurred when the roads went in."  *See Forest Conservation*, 2003 WL 23281957, at *3.  However, that court offered no citation to the record with respect to – nor any further explanation of – that comment. *See Forest Conservation Council*, 2003 WL 23281957, at *3.

If the construction of roads is the sole factor the Forest Service would consider in connection with salvage logging, it is unclear why there is any acreage limit at all in the Tree Salvage CE.  There is no apparent reason to suspect that salvage operations covering less than 250 acres necessarily would not include the construction of roads to reach those acres.[19]  Nevertheless, this CE was designed in conformance with NEPA's requirements.  *See* 40 C.F.R. § 1508.4.  In issuing the Tree Salvage CE and responding to comments that the limitation should be placed on volume harvested (and not acreage size), the Forest Service noted that data from projects surveyed "support the finding that there will be no significant environmental impacts from implementing actions *within these acreage limitations*."  *See* 68 Fed. Reg. at 44604 (emphasis added).  From these points, the Court can conclude that the acreage at issue <u>is</u> a key factor in determining whether a project necessitates at least the completion of an EA prior to proceeding.  If the Road Maintenance and Site Maintenance

---

[18] In their Reply, Defendants also offer the following argument:

> [W]hile the Forest Service may have determined that a 250-acre limitation was appropriate for a CE for salvage logging projects for removing dead and dying trees in previously undisturbed forest stands, it made no finding that such an acreage limitation was necessary or appropriate for the selective removal of only hazard trees within the already-disturbed domain of an existing roadway or recreation area.

Defendants' Reply at 12:23-28.  Yet, the Tree Salvage CE does not distinguish between salvage and hazard trees, nor between previously-undisturbed forest stands and "already-disturbed domain[s]."  It speaks only to the "[h]arvest of fire-damaged trees."

[19] Defendants' argument on this point is also illogical.  CE 31.2.13 clearly has <u>two</u> restrictive parameters: 1) acreage and 2) a limitation that "no more than" a ½ mile of "temporary" road construction could be involved.  Thus, the 250 acre size restriction applies: 1) regardless of the type of forest area (be it disturbed, undisturbed, in Mordor or in Lothlorian) unless extraordinary circumstances are shown, <u>and</u> 2) as a separate restraining factor regardless of any planned road construction.

CEs were to trump the Tree Salvage CE, acreage-limitations would be meaningless as long as the acres affected were within falling-distance of roads or administrative/recreational sites.[20]  Therefore, the purported fact that much of the tree removal under the project will only require the use of road-based machinery is not dispositive of the application of the Tree Salvage CE.[21]

The ultimate problem with Defendants' position herein is that the Forest Service has already considered the issue of when the salvage of dead and/or dying trees and the harvesting of fire-damaged trees can categorically be found not to have a significant effect on the forest environment.  It did so in the process of promulgating CE 31.2.13.  It found that such activities would not have a significant effect by themselves so long as the scope of that conduct: 1) did not exceed 250 acres and 2) did not involve more than 1/2 mile of temporary road construction.

The Forest Service's promulgation of CE 31.2.13 was challenged and upheld in *Colorado Wild v. United States Forest Services*, 435 F.3d 1204 (10th Cir. 2006).  The decision delineated the extensive steps taken by the Forest Service before its adoption of the Tree Salvage CE noting that:

> In 2001, the Forest Service began developing a new set of CEs to cover small-scale timber harvests.  As a basis for proposing a new set of CEs, the Forest Service looked at two sets of data.  The Forest Service first analyzed all 306 timber harvest projects performed under the Former CE for the year 1998, the last year the Former CE was available to the Forest Service. This data was compiled and reviewed to estimate the extent to which the Former CE was used and to determine average project size (in acres) and harvest volume (in board feet).
> Second, in 2001, the Forest Service selected, on a nationwide

---

[20] In considering Plaintiff's argument concerning the applicability of the Tree Salvage CE during the administrative appeal, the Appeal Reviewing Officer noted that "[t]here is not an acreage cap on the number of acres that can be treated using the CE categories identified in the Day Fire Project (Category 4—Repair and maintenance of roads, trails, and landline boundaries and Category 5—Repair and maintenance of recreation sites and facilities)." Defendants' Statement of Uncontroverted Facts and Conclusions of Law ¶ 33; LPDF-0004.  That analysis makes no attempt, however, to explain why acreage limitations are important enough to note in (and limit the application of) some CEs, but not others which would equally relate to the same project or task.

[21] Defendants argue that Plaintiff has not "identified *any* limitation on the CEs that the Project would offend."  Defendants' Motion/Opposition at 15:12-13 (emphasis in original).  It is hard to understand how Defendants can argue this when they have an explicit CE covering salvage logging that limits the area of logging to a maximum of 250 acres.

basis, 154 timber harvest projects that were either (1) approved under the Former CE, (2) approved after an EA or an EIS was prepared but fit within the Former CE requirements, or (3) were otherwise small in scope. This sample consisted of 101 dead timber salvage projects and 53 green timber harvest projects. None of the 154 projects reviewed predicted significant effects on the environment before the project was implemented.

Of the 154 projects reviewed, 122 were approved under the Former CE and were documented with decision memos while 32 were documented with EAs. In addition to reviewing these documents, teams of interdisciplinary resource specialists from the Forest Service (the "Interdisciplinary Teams") conducted on-site, post-implementation assessments of these projects' environmental effects. The Interdisciplinary Teams monitored and documented whether each project met project standards (e.g., Forest Plan Standard or Guidelines, state water qualify standards, etc.) for "soil, water, air, vegetation, wildlife, fish, cultural and historic resources, [and] other pertinent issue related resources." Aplt. App. at 38.

The resulting data indicated that a few of the projects showed "minor soil disturbance and compaction," while a few others showed that "small numbers of noxious weeds or invasive plants entered the area where the trees had been removed." 68 Fed.Reg. 44,598 (July 29, 2003). However, based on the information provided by the Interdisciplinary Teams, the respective Forest Service line officer responsible for each timber harvest project reviewed made a finding that these impacts were not significant in the NEPA context, i.e., they did not individually or cumulatively have a significant effect on the human environment. Id. at 44,599. Thus, the Forest Service considered pre-implementation predicttion and post-implementation verification of no significance in the NEPA context.

Based on the 154 projects reviewed, the Forest Service identified three types of actions that it determined normally do not individually or cumulatively have a significant effect on the human environment.

Id. at 1210-11 (footnote omitted). The Tenth Circuit upheld the methodology employed by the Forest Service finding that it was not arbitrary or capricious. *Id.* at 1217. It also rejected the many substantive challenges to the CE. *Id.* at 1217-22.

In sum, the Forest Service has already determined that it cannot be categorically concluded that the salvage/harvest of dead or fire damaged trees from an area in excess of 250 acres will not have a significant effect on the environment. Therefore, Defendants' attempt (to ignore that prior promulgated position covering the actual issue of tree removal and instead to use two CEs dealing with road and recreational site maintenance to establish a lack of environmental impact by a project whose principal activity is the removal of trees on 350 acres of national forest land) is arbitrary and capricious.

Though it is true that "[o]nce the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference," *Alaska Center*, 189 F.3d at 859, here the Forest Service appears to have either ignored or entirely dismissed a self-imposed factor – acreage limitations on the "salvage" of dead or dying trees or the "harvest" of fire-damaged trees. While removal of such trees from along roadways and other sites frequented by humans may make good policy sense from a safety perspective,[22] this is not to say that such a decision necessarily excludes the potential for significant environmental effects. Due to the acreage of trees involved, the Forest Service plainly erred in making use of the Road Maintenance and Site Maintenance CEs and its decision to do so was arbitrary and capricious under the standards set forth in *Sierra Club*, 510 F.3d at 1023. The Court will grant Plaintiff's motion for summary judgment as to its first and second claims for relief. Because continuation of the project may cause an environmental injury, an injunction is likely appropriate here; but, as discussed below, there are questions as to the appropriate relief. *See generally Sierra Club*, 510 F.3d at 1033.

### iii. Extraordinary Circumstances

Plaintiff further argues that, even if one of the CEs applied here, the project's threatened impact upon the California condor presents "extraordinary circumstances" excepting the project from coverage by any CE.[23] Before relying on a CE, an agency must determine that extraordinary circumstances do not exist. *See Norton*, 311 F.3d at 1170. As noted above, however, Plaintiff has failed to exhaust any claims related to the condor.

Even if Defendants' exhaustion argument does not dispose of Plaintiff's concerns about the effects on the California condor, the evidence does not demonstrate any effects on the condor that would rise to the level of "extraordinary circumstances" under the applicable law. "If extraordinary circumstances having a significant effect on environment are revealed during scoping, then the Forest Service conducts an EA." *Alaska Ctr.*, 189 F.3d at 858. Contrary to Plaintiff's allegation that the project "includes logging closer than one-half mile

---

[22] Of course, the Court's object here is not to pass judgment on the Forest Service's ultimate decision, but only to determine that it followed the proper procedures in reaching its decision.

[23] Plaintiff alleges the same theory in its FAC as to the yellow-blotched salamander yet, as noted further below, it makes no argument here with respect to the salamander.

to traditional condor roost trees," FAC ¶ 40, the evidence demonstrates that there are no active condor roosts or nests within the project area and that the likelihood of a condor appearing in the area – other than by flying overhead – is slim. *See* Defendants' Statement of Genuine Issues of Material Fact ¶ 25; LPDF-0274. Even if a condor does appear, the Forest Service requires the project's cessation until the bird is no longer present. *See* Defendants' Statement of Genuine Issues of Material Fact ¶ 25; Defendants' Statement of Uncontroverted Facts and Conclusions of Law ¶ 29; LPDF-0169; LPDF-0274. Given the evidence and the project's design, there will be no "significant effect" on the condor. At the very least, the Forest Service's conclusion in this regard was not an abuse of discretion and they were not precluded – because of effects on the condor – from relying on a CE.

### c. Plaintiff's NFMA Argument

Plaintiff also asserts that the Forest Service violated the NFMA by determining that the project was consistent with the Forest Service's relevant Forest Plan with respect to standards for protecting the California condor. As noted above, Plaintiff's argument under the NFMA, at least insofar as it relates to the California condor, is barred by Plaintiff's failure to exhaust. Were that not true, however, Plaintiff's NFMA claim would still fail.

The Forest Service's Forest Plan obligates the Forest Service to "[a]void or minimize disturbance to breeding and roosting California condors by prohibiting or restricting management activities and human uses within 1.5 miles of active California condor nest sites and within 0.5 miles of active roosts." Plaintiff argues that, because the Forest Service inaccurately characterized its project as being "near," rather than "in" the California condor's habitat and because the Forest Service has incorporated no provisions to ensure that it complies with its Forest Plan in protecting the condors, the project is not only inappropriate for a CE, but also violates the NFMA.

However, as noted above, the evidence demonstrates that there are no condor roosts or nests within the project area and that the likelihood of a condor appearing in the area – other than by flying overhead – is slim. Even if a condor does appear, the Forest Service requires the project's cessation until the bird is no longer present. Because of those uncontroverted facts, Plaintiff cannot prevail on its NFMA claim (assuming the exhaustion

argument is insufficient to dispose of it), at least insofar as it relates to the condor.[24]

### 3. The Continuing Viability of the Yellow-Blotched Salamander's Legal Habitat

A question remains whether the yellow-blotched salamander continues to inhabit this case.  Although the amphibian is a resident of Plaintiff's fourth claim for relief, the parties' papers fail entirely to substantively address it.  In their motion papers, Defendants claim that Plaintiff's failure to raise the issue of the salamander in Plaintiff's summary judgment papers constitutes a waiver of the salamander-related claims.  However, simply because a party does not include a claim in its summary judgment motion does not mean that the party has waived or abandoned that claim in the case in general.  The cases Defendants cite for this proposition do not support it.[25]  *See Maryland Cas. Co. v. Knight*, 96 F.3d 1284, 1291 (9th Cir. 1996) (deeming issue abandoned on appeal when no substantive argument raised on appeal in connection with issue appealed); *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (indicating that appellate court reviews "only issues which are argued specifically and distinctly in a party's opening brief").  Nor can Defendants prevail on Plaintiff's salamander-related claim, as their only discussion of the salamander consisted of asserting that Plaintiff had waived any claim related to it.[26]

As such, it is unclear just what the Court can do on these motions with respect to Plaintiff's fourth claim for relief.  It could conceivably grant partial summary judgment on Plaintiff's first three claims and that portion of his fourth claim which involves the condor, but the salamander would presumably remain lurking in the carved-out hollow of the action.  If Plaintiff intends to dismiss that part of its fourth claim, it should do so.

---

[24] In addition, the project does not include any critical habitat areas for the condor.  *See* 41 Fed. Reg. 41914-16.

[25] Strangely, however (perhaps because it does not in fact intend to pursue any salamander-related claim), Plaintiff "admits" this conclusion of law.  *See* Defendants' Statement of Uncontroverted Facts and Conclusions of Law, Conclusion of Law ¶ 13; Plaintiff's Statement of Genuine Issues of Material Fact, Conclusion of Law ¶ 13.

[26] While Defendants' Notice of Motion stated that they sought "summary judgment in favor of Federal Defendants on all claims in this case," Defendants' Notice of Motion at 2:8-9, the Notice also specified that the grounds for the request were set forth in the memorandum of points and authorities, *id.* at 2:12-14.  Here, the only grounds raised – waiver – are insufficient for purposes of granting Defendants' motion as to the salamander-related claims.

C. <u>Remedy</u>

To the extent that this Court finds arbitrary and capricious conduct by the Defendants and awards summary judgment to the Plaintiff, there arises a question of the appropriate remedy. Plaintiff seeks, in part, declaratory and injunctive relief to the effect that "salvage logging ... in the Day Fire Area may only be conducted with, at least, an Environmental Assessment and a Finding of No Significant Impact." *See* FAC at page 14. However, it can be argued that the Defendants can come into compliance with the requirements of NEPA in a number of ways. For example, aside from preparing an EA, Defendants could instead amend the project to limit the salvaging or harvesting of hazard trees to an area less than 250 acres. Moreover, there may be factors unknown to this Court that would impact on the issue of the balance of harms in regards to the issuance of injunctive relief.[27] Thus, the Court would stay any logging but allow the Defendants to indicate what steps they will take to remedy the problem.

---

[27] For example, this Court was unaware until reading the *Forest Conservation Council* case that there may be a time period after which dead trees begin to lose their commercial value. *See* 2003 WL 23281957 at page 5.